UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL L. HANNA, JR.,

      Plaintiff,

vs.

Case No. 04-CV-70287
HON. GEORGE CARAM STEEH

E.I. du PONT de NEMOURS AND COMPANY, INC.,

      Defendant.

_____/

<u>ORDER GRANTING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (#26) AS TO PLAINTIFF'S WRONGFUL DISCHARGE
AND BREACH OF CONTRACT CLAIMS, DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (#26) AS TO PLAINTIFF'S ELCRA
RETALIATION ANS DISCRIMINATION CLAIMS;
AND DENYING PLAINTIFF'S MOTION FOR A SETTLEMENT CONFERENCE (#51)</u>

      Defendant E.I. du Pont de Nemours and Company ("DuPont") moves for summary judgment of plaintiff Samuel Hannah, Jr.'s claims of wrongful discharge in violation of a DuPont Administrative Guide, breach of just cause contract, and race discrimination and retaliation in violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §§ 37.2101, <u>et</u> <u>seq</u>.. A hearing on the motion was held on November 28, 2005. For the reasons set forth below, DuPont's motion for summary judgment will be GRANTED, IN PART, as to Hannah's wrongful discharge and breach of contract claims. DuPont's motion for summary judgment will be DENIED, IN PART, as to Hannah's ELCRA race discrimination and retaliation claims. Hannah's motion for a settlement conference will be DENIED.

## **I. Background**

Hannah filed a complaint in Michigan's Macomb County Circuit Court on December 30, 2003 alleging he was employed as a "Site Buyer" at DuPont's Mt. Clemens, Michigan facility when he was wrongfully discharged on September 23, 2003 after 29 years of employment. The lawsuit was removed to federal district court on January 27, 2004 based on federal diversity jurisdiction[1]. Since the November 28, 2005 hearing on DuPont's motion for summary judgment, the parties have attended two status conferences in efforts to reach a settlement. On March 22, 2006, Hannah filed a motion for another settlement conference.

Hannah, an African-American, administered certain DuPont vendor contracts. Hannah's immediate supervisor Sofya Gellar testified she began documenting conversations she had with Hannah about his job performance in January 2003 upon the advice of DuPont Human Resources Department Head Scott Landis. According to Gellar, Hannah complained directly to Landis that Gellar was a "hard manager" and that he was working "harder than others." Hannah testified that, in one private meeting with Gellar, Gellar threw files at him. Landis' subordinate, Industrial Relations Manager David Mosley, later told Gellar that Hannah had complained to him about Gellar's management style. Gellar testified that, after talking to Landis and Mosley, she transferred some of Hannah's responsibilities to other Site Buyers, informing Hannah that she had talked to Landis and Mosley.

According to Gellar, she began investigating Hannah's vendor contracts for Dupont's

---

[1] Hannah is a citizen of Michigan. DuPont is a citizen of Delaware, being a Delaware corporation with its principal place of business in Delaware. See 28 U.S.C. § 1332.

2

Rochester, New York, facility after a vendor placed an August 26, 2003 "credit hold" on a DuPont account because payment was not received within 30 days, and after a second vendor threatened on August 27, 2003 to discontinue providing security services in the absence of a contract extension. Hannah's contractual authority was suspended pending Gellar's comparisons of vendors' copies of contracts with plaintiffs' copies of vendors' contracts. Hannah admits that he made some unilateral changes to vendor contracts.

Hannah filed an internal "People Treatment" complaint against Gellar, but did not allege race discrimination in the written complaint. The internal complaint was investigated by Human Resources Coordinator Lori Smith, who concluded on September 18, 2003 that Hannah's complaint of "disrespectful treatment" was not proven. Hannah was terminated following a "Termination Review" headed by DuPont Manager Steve Ballew. The formal reasons given for Hannah's termination were "Repeated Acts of Serious Misconduct By Falsification of Records," and "Legal Contracts Between Vendors and DuPont were repeatedly and deliberately distorted, misleading, and false," in violation of Sections 5 and 26B of DuPont's "Administrative Guide." Hannah instituted a "Peer Review Grievance Procedure" on September 23, 2003. The five-member grievance panel denied Hannah's appeal on October 1, 2003, finding that "management followed Administrative Guide Section 5 Corrective Action correctly and consistently."

## II. Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See

Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences arising therefrom must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence. Anderson, 477 U.S. at 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

### A. Wrongful Discharge/Breach of Just Cause Contract

Hannah relies on Sections 4 and 5 of Dupont's Administrative Guide, and Industrial Relations Manager Mosley's deposition testimony that "with Dupont we just follow our administrative guide" to make sure we have "good reason" for terminating an employee, to support his claim that he was employed under a just cause employment contract.

Under Michigan law, Hannah's indefinite term employment contract is presumed to

4

be an at-will contract. Dolan v. Continental Airlines, 454 Mich. 373, 383, 563 N.W.2d 23 (1997) (citing Toussaint Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880 (1980)). Dupont's Administrative Guide, providing for progressive discipline as well as outlining infractions serious enough to merit immediate termination, is not an all-inclusive list of acts for which an employee may be terminated for cause, and is thus insufficient to create a just cause contract. Id. at 388 (quoting Rood v. General Dynamics Corp., 444 Mich. 107, 142, 507 N.W.2d 591 (1993) for the proposition that "[a] non-exclusive list of common-sense rules of behavior that can lead to disciplinary action or discharge, clearly reserves the right of an employer to discharge an employee at will"). Informal policies requiring a "good reason" for discharging an employee are likewise insufficient to create a just cause contract. Rood, 444 Mich. at 126. Hannah's own testimony that he did not know whether he was employed under an at-will or just cause contract before he talked to his previous counsel establishes that he did not entertain a subjective belief of an implied-in-fact just cause contract. See Clement-Rowe v. Michigan Health Care Corp., 212 Mich. App. 503, 538 N.W.2d 20 (1995) (holding that statements made by management must create both an objective and subjective belief of just cause employment).

Hannah's reliance on Renny v. Port Huron Hospital, 427 Mich. App. 415, 398 N.W.2d 327 (1987) is misplaced. Unlike the Employee Handbook in Renny, DuPont's Administrative Guide does not expressly state that DuPont's right to discharge is "subject only to the regulations and restrictions outlined in" the Administrative Guide. Compare Renny, 427 Mich. at 427. Dolan, decided 10 years after Renny, confirmed that non-inclusive rules for discharge do not create a just cause contract. Dolan, 454 Mich. at 388. Written company policies may create a just cause contract "only when the circumstances

. . . clearly and unambiguously indicate that the parties so intended." Id. at 386 (quoting Rood, 444 Mich. at 137). Hannah has failed to proffer evidence which would allow a reasonable jury to conclude that he was employed under a just cause contract. Under Hannah's at-will contract, Hannah could legitimately be terminated "for any reason or for no reason at all." Rood, 444 Mich. at 116. DuPont is entitled to summary judgment of Hannah's claims of wrongful discharge and breach of contract[2] as each claim is premised on the existence of a just cause contract. Amway, 323 F.3d at 390; McLean, 224 F.3d at 800.

## B. ELCRA Claims

### I. Retaliation Prima Facie Case

Michigan's ELCRA provides that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. § 37.2701(a). A prima facie case of unlawful retaliation requires a showing that: (1) the plaintiff was engaged in activity protected by the ELCRA; (2) the defendant knew the plaintiff was engaged in such activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action. Garg v. Macomb County Community Mental Health Servs., 472 Mich. 263, 291-92, 696 N.W.2d 646 (2005) (quoting DeFlaviis v. Lord & Taylor, Inc., 223 Mich. App. 432, 436, 566 N.W.2d 661

---

[2] Count I alleging wrongful discharge alleges "Plaintiff's discharge was without just cause." Complaint, ¶ 16, at 3. Count II alleging breach of contract alleges "By terminating plaintiff's employment without just and/or proper cause, defendant breached its contract with plaintiff." Complaint, ¶ 20, at 3.

(1997)).

Hannah's retaliation claim is premised on his deposition testimony that he complained to Industrial Relations Manager Mosley that Gellar was discriminating against him because of his race, and approximately a month later, he was discharged after Gellar's investigation of his vendor contracts. To state an actionable claim based on retaliation for "opposing a violation of [the ELCRA]," the plaintiff is not required to formally invoke or specifically site the ELCRA. Bromley v. Parisian, Inc., No. 01-1874, 55 Fed.Appx. 232, 236-37 (6th Cir. Dec. 20, 2002) (unpublished) (citing Barrett v. Kirtland Cmty. Coll., 245 Mich. App. 306, 318-19, 628 N.W.2d 63 (2001), and McLemore v. Detroit Receiving Hosp., 196 Mich. App. 391, 396, 493 N.W.2d 441 (1992)). Instead, "the employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination." Bromley, 55 Fed.Appx. at 237 (quoting Barrett, 245 Mich. App. at 319).

Hannah testified at his deposition:

Q. Okay. Now, in your meetings with Mr. Mosley, it's true, is it not, that you never said point blank, I believe [Gellar's] doing this because I'm black; isn't that right?

A. [by Hannah] I don't remember those exact words but discrimination, racial discrimination was a part of our conversation.

Q. Why don't you tell me how they were a part of your conversation.

A. That [Gellar's] behavior towards me in regards to the screaming and the throwing of the files and the amount of work that Al Geers did I felt was based on race.

Hannah April 8, 2005 Transcript, at 105. Construing Hannah's testimony in a light most favorable to Hannah, a reasonable jury could conclude that Hannah clearly conveyed to

DuPont through Mosley that he was raising the specter of a racial discrimination claim. Bromley, 55 Fed.Appx. at 237.

DuPont argues that Hannah's retaliation claim is nonetheless subject to summary judgment because mere temporal proximity between Hannah's complaint to Mosley and his discharge is insufficient to prove a causal connection between the two events. "Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." West v. General Motors Corp., 469 Mich. 177, 186, 665 N.W.2d 468 (2003). The Michigan Supreme Court in West distinguished the case before it from the actionable retaliation claim recognized in Henry v. Detroit, 234 Mich. App. 405, 594 N.W.2d 107 (1999), reasoning that "unlike plaintiff, the plaintiff in Henry also presented evidence that his superior expressed clear displeasure with the protected activity engaged in by the plaintiff." Id. at 186-87. The Henry plaintiff, a 28-year veteran police officer, produced evidence that after he engaged in conduct protected by Michigan's Whistleblower's Protection Act ("WPA") by testifying in a civil lawsuit, he was told that the police chief was upset with him and was treated differently than he had been in the past. Henry, 234 Mich. App. at 414. Four months after engaging in WPA protected activity, the Henry plaintiff was forced to choose between demotion or retirement. Id. The court in Henry concluded that the plaintiff had presented a prima facie retaliation case, and that "[w]hether the deposition or plaintiff's job performance was the real reason for defendant's action against plaintiff was a question properly left to the jury." Id.

As in Henry, Hannah, a 29-year employee, has come forward with evidence in addition to temporal proximity to demonstrate a causal connection between his alleged

complaint of racial discrimination to Mosley and his ultimate termination. According to Gellar herself, Mosley told her in August 2003 that Hannah had complained to him about her. Hannah testified that Gellar was "angry" when she told him she had spoken to Human Resources Department Head Scott Landis about Hannah's complaints to Landis, and that "she mentioned to me about going and I think and complaining to Scott, and she was unhappy with it and it was -- it wasn't a lengthy conversation, but what I got from the conversation, you went to Scott, you told Scott some things about me and I wasn't unhappy with it and its something you and I have to work out." Hannah April 15, 2005 Transcript, at 195-96. An "Investigation Process" memorandum proffered by DuPont indicates that "HR" was contacted by Hannah at the "End of August or First of September," and that "Mosley began to Fill the Roll of Employee Advocate." Defendant's September 9, 2005 Exhibit 7. The document continues that Gellar met with Hannah on September 5, 2003 "To Review Contract Variances and to Get The Facts From His Side," and that on September 8, 2003, "An investigation Team of Knowledge Resources in the Sourcing Field Met To Further Investigate . . . ." Id. Gellar testified that she was a member of the "Investigation Team," along with decisionmaker Ballew, Tim Perry, and Rich Anderson. On September 15, 2003, a review of "Investigation Findings" lead to the decisions to revoke Hannah's "Execution Authority Which Disqualified Him As a Site Buyer," and to require Hannah to "Stay At Home While The Investigation Continued." Defendant's September 9, 2005 Exhibit 7. The investigation ultimately concluded on September 24, 2003 when a "Termination Meeting" was held with Hannah. Construing the evidence in a light most favorable to Hannah, Gellar initiated the investigation of Hannah after learning from Landis and/or Mosley that Hannah had complained about her discriminatory treatment, and

9

Hannah was terminated less than three weeks later after the "Investigation Team" of which Gellar was a member recommended termination. Hannah has met his burden of coming forward with evidence of more than a mere temporal connection between his alleged complaint of racial discrimination and his discharge. West, 469 Mich. at 186; Henry, 234 Mich. App. at 414; First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800.

DuPont asserts that Hannah cannot demonstrate unlawful retaliation for complaining about *race* discrimination because Gellar, Mosley, Landis and decisionmaker Ballew each have denied knowing that Hannah was complaining about race discrimination as opposed to general mistreatment. The court disagrees. Hannah testified that he did complain to Mosley about race discrimination. Hannah April 8, 2005 Transcript, at 105. The court is prohibited from making a credibility assessment on summary judgment, and must instead view the record evidence in a light most favorable to non-movant Hannah. See Ahlers v. Schebil, 188 F.3d 365, 369 (6th Cir. 1999) (citing Anderson, 477 U.S. at 255)). In that light, Hannah has directly challenged Mosley's credibility and raised a genuine factual dispute whether Mosley did in fact know that Hannah was complaining about race discrimination. In that only Mosley, Gellar, Landis, and Ballew were privy to their own discussions about Hannah, the self-serving nature of their denials of knowledge that Hannah was complaining about race discrimination, the credibility issue raised by Hannah's testimony, and Gellar's direct participation in the immediate investigation of Hannah's contracts that culminated in Hannah's discharge less than a month later, a reasonable inference arises that, at minimum, Gellar and Mosley knew that Hannah had complained of unlawful *race* discrimination. See Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1458-59, 1459 n. 2 (7th Cir. 1994). Even assuming Landis and asserted decisionmaker Ballew did

10

not know that Hannah had complained about race discrimination, such would not preclude a finding of retaliatory discharge given Gellar's undisputed involvement as a member of the "Investigation Team" that recommended Hannah's discharge. See Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 877 (6th Cir. 2001) (citing Wilson v. Stroh Cos., 952 F.2d 942, 946 (6th Cir. 1992) for the proposition that evidence of a supervisor's racial animus may support a race discrimination claim where the supervisor "somehow influenced the ultimate decisionmaker," as by preparing the report relied upon by the decisionmaker); Dey, 28 F.3d at 1459 (reasoning that "[s]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other information that may have affected the adverse employment action"); Shager v. Upjohn Co., 913 F.2d 398 (7th Cir. 1990) (quoted with approval in Christian, 252 F.3d at 877 for the proposition that "if the committee acted as the conduit of the [supervisor's] prejudice -- his cat's paw -- the innocence of its members will not spare the company from liability" (internal quotations omitted)). Hannah has met his burden of coming forward with evidence to support a prima facie claim of retaliation in violation of the ELCRA. Garg, 472 Mich. at 291-92; First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800.

### ii. Disparate Treatment Prima Facie Case

Michigan's ELCRA prohibits an employer from discharging an employee because of their race. M.C.L. § 37.2202(1)(a). Absent direct evidence of unlawful discrimination, the plaintiff must show a prima facie case that: (1) he is a member of the protected class; (2) he suffered an adverse employment action such as discharge; (3) he was qualified for the position; and (4) he was discharged under circumstances giving rise to a reasonable inference of unlawful discrimination. Lytle v. Malady (On Rehearing), 458 Mich. 153, 172,

11

573 N.W.2d 906 (1998). Circumstances giving rise to a reasonable inference of unlawful discrimination may include a showing that the plaintiff was treated differently by the employer than a person outside that protected class. Reisman v. Regents Wayne State Univ, 188 Mich. App. 526, 538; 470 NW2d 678 (1991).

Hannah proffers evidence that he was treated differently than certain Caucasian DuPont employees that committed the same or similar acts which DuPont also deemed "falsification of documents" under the Administrative Guide. DuPont primarily relies on Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992) in responding that the Caucasian employees Hannah refers to were not "similarly situated" for purposes of an ELCRA disparate treatment analysis because the other employees did not perform the same job duties as Hannah, they worked in different departments, they did not share the same job classification, they had different supervisors, they were not accused of the same misconduct, different individuals made the disciplinary recommendations, and different peer review panels heard their appeals.

Michigan courts have consistently applied analogous federal precedent in addressing the issue of whether employees were "similarly situated" for purposes of deciding ELCRA discrimination claims. See Town v. Michigan Bell Telephone Co., 455 Mich. 688, 700, 700 n.23, 568 N.W.2d 64 (1997) (Brickley, J.) (applying Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) in holding that "all of the relevant aspects" of the employment situation must be "nearly identical"); DeFlaviis, 223 Mich. App. at 437 (recognizing that Title VII precedents analogous to issues arising under the ELCRA are considered highly persuasive although not binding). The Sixth Circuit has since clarified its holdings in Mitchell and Smith:

12

> We explained in Mitchell that when the plaintiff lacks direct evidence of discrimination, "the plaintiff must show that the 'comparables' are similarly-situated in all respects," absent other circumstantial or statistical evidence supporting an inference of discrimination. Id. at 583. Although this statement appears to invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment, Mitchell has not been so narrowly construed. In Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994), this court explained that the plaintiff was simply "required to prove that all of the *relevant* aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." Id. at 802 (emphasis added); see also Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing Mitchell in support of the proposition that "[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all *relevant* respects" (emphasis added)); Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C.Cir. 1995) (quoting Pierce ); Byrd v. Ronayne, 61 F.3d 1026, 1032 (1st Cir. 1995) ("A disparate treatment claimant bears the burden of proving that she was subjected to different treatment than persons similarly situated in all relevant aspects." (quotation omitted)). Mitchell itself only relied on those factors relevant to the factual context in which the Mitchell case arose--an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment. We held that to be deemed "similarly-situated" in the disciplinary context, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583. These factors generally are all relevant considerations in cases alleging differential disciplinary action. Cf. Pierce, 40 F.3d at 802 (explaining that the distinction in supervisory status between plaintiff and non-minority employee also accused of sexual harassment was relevant because company's liability under Title VII for sexual harassment could depend on employee's status). Courts should not assume, however, that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects." Pierce, 40 F.3d at 802 (emphasis added).

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (footnote

omitted).

According to the testimony of Tina Crayton, one of five members of the Peer Review Panel that denied Hannah's termination appeal, the situations of three other Dupont employees were discussed among the Peer Review Panel during the appeal: Chris Reed, Dave Muylaert, and Al Piazza. Crayton August 19, 2005 Transcript, at 15-17. Reed, Muylaert, and Piazza, like Hannah, had been found to have "falsified documents." Id. Reed actually appeared before the Peer Review Panel:

> Q. Why was Reed asked questions?
>
> A. [by Crayton] He was asked questions because we felt like -- the panel had known of a situation that he had had which involved falsification of documents and we wanted to hear what he had to say.
>
> Q. Do you recall what he said?
>
> A. Not exactly what he said, no.
>
> Q. Do you recall whether it was your conclusion that he had or had not falsified documents as Mr. Hannah had been accused of?
>
> A. Yes.
>
> Q. He had falsified documents?
>
> A. He had.
>
> Q. And he hadn't been discharged?
>
> A. Correct.

Id. at 15-16. In overturning the recommended discharge of Piazza on appeal, another Peer Review Panel explained:

> During our investigation, we discovered several instances of similar infractions which did not result in the same corrective action. As a result of this inconsistent application, we have decided to grant your appeal.

14

Defendant's September 9, 2005 Exhibit 16.

Construing the evidence in a light most favorable to Hannah, DuPont itself concluded that Reed, Muylaert, and Piazza were similar enough in relevant aspects of their employment to compare their situations with Hannah in determining whether to discharge Hannah notwithstanding that Hannah was the only one who worked as a non-exempt Site Buyer supervised by Gellar who was initially accused and investigated by Gellar of "falsification of documents." The overruling of Piazza's discharge on appeal indicates that Peer Review Panels review "similar infractions which did not result in the same corrective action" for a possible "inconsistent application" of the Administrative Guide. Indeed, in affirming Hannah's termination, the Peer Review Group found that the DuPont Administrative Guide, the same guide applicable to Reed, Muylaert, and Piazza, had been "correctly and *consistently*" applied. Defendant's September 9, 2005 Exhibit 13 (emphasis added). As instructed by Ercegovich, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct *without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.*" Ercegovich, 154 F.3d at 352 (quoting Mitchell, 964 F.2d at 583) (emphasis added). Unlike the factual scenario typically before a court where the plaintiff alone attempts to compare himself with former co-employees, the unique circumstances of this case involve the employer DuPont comparing the treatment of Reed, Muylaert, and Piazza with its treatment of Hannah in determining whether the Administrative Guide was being consistently applied. The situation is analogous to that before the Michigan Court of Appeals in Sisson v. Bd. of Regents of the University of Michigan, 174 Mich. App. 742, 750,

436 N.W.2d 747 (1989), which rejected the employer's argument that employees who worked for different supervisors in different departments were not "similarly situated" where the employer had relied on these same employees in a list proffered to support its own position of consistently discharging employees for theft. Ultimately in this situation, it is for the jury to decide whether to draw an inference of race discrimination from a comparison of DuPont's treatment of Hannah, Reed, Muylaert, and Piazza. Hannah has come forward with evidence to support his prima facie case that he was treated differently by the employer than a person outside the protected class. Reisman, 188 Mich. App. at 538; First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800.

In addition to comparisons with DuPont's treatment of Reed, Muylaert, and Piazza, Hannah has also proffered evidence of additional circumstances giving rise to a reasonable inference of race discrimination, including but not limited to the evidence proffered in support of Hannah's retaliation claim. Lytle, 458 Mich. at 172. Construing the evidence in a light most favorable to Hannah, Gellar instigated a formal investigation of Hannah's vendor contracts very soon after she learned that Hannah had complained to Mosley that she was discriminating against him on the basis of his African-American race. Further, while Gellar's Caucasian subordinates Al Geers and Ed Wade attest that "Gellar was a demanding supervisor who often spoke in a terse manner and raised her voice" but her "demeanor was not inappropriate or offensive," Hannah has testified that, at "numerous times[,] Mrs. Gellar's mannerism towards me, it was yelling and screaming, accompanied by the throwing of the files." Hannah August 15, 2005 Transcript, at 149. See also Hannah April 5, 2005 Transcript, at 97 (Hannah describing that Gellar threw files at him and would "yell and scream at me where everyone in the office could hear, which is very humiliating

16

to me, and I never seen her conduct herself toward the two other white gentlemen that worked in that department").

### iii. McDonnell Douglas Analysis

As here, once the plaintiff has demonstrated a prima facie case of retaliation and disparate treatment in the absence of direct evidence, a McDonnell Douglas[3] analysis is applied, requiring the employer to produce evidence of a legitimate reason for the discharge. Town, 455 Mich. at 695. If the employer meets this burden of production, the plaintiff is required to submit admissible evidence that the employer's nondiscriminatory reason was not the true reason for the discharge, but a mere pretext for discrimination, and that the plaintiff's race was a motivating factor in the discharge decision. Id. at 697. Three ways to establish pretext include: (1) by showing that the reasons proffered by the employer have no basis in fact; (2) if the reasons have a factual basis, that they are not the actual factors that motivated the discharge decision; or (3) if the proffered reasons were factors, that the reasons were nonetheless insufficient to justify discharge. Dubey v. Stroh Brewery Co., 185 Mich. App. 561, 565-66, 462 N.W.2d 758 (1990). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).

DuPont has met its burden of producing evidence that Hannah was discharged for the legitimate reason of "falsifying" vendor contracts. In turn, the evidence proffered in support of Hannah's prima facie claims of retaliation and disparate treatment in violation

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1993).

of the ELCRA, construed in a light most favorable to Hannah, would permit a reasonable jury to conclude that Hannah's alleged falsification of vendor contracts was not the actual factor motivating his discharge, or was insufficient to justify his discharge, raising a reasonable inference that Hannah's African-American race was a motivating factor in the discharge decision. Town, 455 Mich. at 697; Dubey, 185 Mich. App. at 565-66; Reeves, 530 U.S. at 148. Dupont's invocation of the business judgment rule is misplaced in light of the evidence Hannah has produced raising legitimate inferences of unlawful racial motivations. See Dubey, 185 Mich. App. at 565-66 (finding that younger age of equally qualified successful job candidate did not establish age discrimination in the absence of any evidence which would lead to a legitimate inference of age related animus). As DuPont points out, Hannah does not dispute that he unilaterally changed vendor contracts. The record evidence shows that Hannah added a term "Replaces [Contract] LD 41875" to a contract, changed another contract to reflect a termination date of "April 30, 2004" to "July 31, 2004," removed an inadvertent effective contract date of "July 31, 2004," and changed a "Metro Group" Contract, stating "payment will be net thirty (30) days" after receipt of invoice to "payment will be net thirty (60) days" after receipt of invoice. There is no evidence that Hannah profited from these changes, or that DuPont suffered any loss. Coupled with the evidence supporting a finding that Gellar retaliated against Hannah for complaining about race discrimination, that Gellar treated Hannah harsher than her Caucasian subordinates Geers and Wade, and that Caucasian employees Reed, Muylaert, and Piazza committed similar acts of "falsifying documents" but were not discharged, a jury could conclude that the "business judgment" used to fire Hannah was merely a pretext for a racially motivated discharge. Town, 455 Mich. at 697; Dubey, 185 Mich. App. at 565-66;

Reeves, 530 U.S. at 148. The question here is not whether DuPont "honestly believed" that Hannah "falsified documents," its whether face discrimination was a motivating factor in the decisions to investigate and ultimately discharge Hannah. Construing the totality of the evidence in a light most favorable to Hannah, a sufficient disagreement exists as to Dupont's true motivations for discharging Hannah, and therefore Hannah's ELCRA claims must be submitted to a jury. Amway, 323 F.3d at 390; McLean, 224 F.3d at 800. DuPont is not entitled to summary judgment of Hannah's ELCRA claims.

### III. Motion for Settlement Conference

With the court's ruling today, this matter is now ready for trial as to Hannah's remaining ELCRA claims. Final Pretrial Conference and trial dates will be scheduled under separate Order. Given the parties' positions as expressed at early conferences, the court is not persuaded that an additional settlement conference is warranted. Accordingly, Hannah's motion for a settlement conference will be denied without prejudice in anticipation of the Final Pretrial Conference. In the event both parties wish to discuss settlement in advance of the Final Pretrial, the court will be pleased to schedule such a conference.

### IV. Conclusion

DuPont's motion for summary judgment is hereby GRANTED, IN PART, as to Samuel Hannah's claims of wrongful discharge and breach of contract. Count I alleging wrongful discharge, and Count II alleging breach of contract, are hereby DISMISSED with prejudice. Dupont's motion for summary judgment is hereby DENIED, IN PART, as to Hannah's claims of race discrimination and retaliation in violation of the ELCRA as alleged in Counts III and IV. Hannah's motion for a settlement conference is hereby DENIED without prejudice. Final Pretrial Order, Final Pretrial Conference, and Trial dates will be

scheduled under separate Order.

      SO ORDERED.

                                  s/George Caram Steeh
                                  GEORGE CARAM STEEH
                                  UNITED STATES DISTRICT JUDGE

Dated: June 13, 2006

                        CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on June 13, 2006, by electronic and/or ordinary mail.

                                  s/Josephine Chaffee
                                  Secretary/Deputy Clerk